## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| | * | |
| TNR Holdings, LLC | * | Case No. 19-12531 |
| | * | |
| Debtor | * | Section "A" |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| | * | |
| Mesa Gulf Coast, LLC | * | Case No. 19-12533 |
| | * | |
| Debtor | * | Section "A" |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| | * | |
| Tchefuncte Natural Resources, LLC | * | Case No. 19-12532 |
| | * | |
| Debtor | * | Section "A" |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING <u>THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING</u>**

NOW INTO COURT, comes the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") which respectfully state the following in support of this motion (this "<u>Motion</u>").

1

**Preliminary Statement** [1]

1.      The Debtors own and operate four oil and gas fields which are known as the Valentine Field, Larose Field, Lake Hermitage Field, and Bay Batiste Field (collectively "Fields"). The Fields are located in Southeast Louisiana and more specifically in Plaquemines Parish and Lafourche Parish.  Only the Valentine Field has wells that are currently producing oil and gas. However, certain wells in the Valentine Field are not operating at maximum capacity and need repairs and work to be completed in order to optimize production of oil and gas from these wells. The wells on the Larose Field, Lake Hermitage Field, and Bay Batiste Field are not currently producing. The Debtor may have to release these properties back to the state and he wells in those fields may have be orphaned.  The Debtor does not have sufficient cash on hand to perform the work required to optimize production from the Valentine Field wells and continue its business operations.  The Debtors have commenced these chapter 11 cases in an effort to repair and sell the Valentine Field in order to pay down the debt owed to the secured lender, Hancock Whitney. All of the Debtors' assets are subject to mortgages and security interests of Hancock Whitney whose debt far exceeds the value of the Debtor's assets.

2.      Faced with limited liquidity, the Debtors engaged in discussions with its existing secured lender, Hancock Whitney Bank ("Secured Lender") regarding the terms of postpetition financing.  Debtors' efforts to obtain financing from any other source were not successful, given the Debtors' current financial conditions, and the challenges and costs inherent in pursuing a "priming" fight with the Debtors' existing Secured Lender.   Following good faith and arm's-length

---

[1] Capitalized terms used but not immediately defined in their respective sections have the meanings given to such terms further below in this Motion, the DIP Documents, or the Interim Order, as applicable.

negotiations, the Debtors ultimately agreed to the terms of a $150,000 superpriority, priming secured revolving DIP facility (the "DIP Facility").

3.       The DIP Facility provides up to $150,000 of new money subject to entry of the Final DIP Order (as defined below).

4.       The DIP Facility allows the Debtors to immediately access up to $75,000 upon entry of the Interim DIP Order (as defined below) to not only continue to pay their operating expenses but also to provide a critical breathing spell in which to allow the Debtor to repair the Valentine Field wells and market the Valentine Field for sale which will maximize the value of the estate.

5.       Absent entry into the DIP Facility, the Debtors will have insufficient liquidity to continue operating in the ordinary course and the Debtors' efforts to maximize production from the wells will come to a halt. As of the Petition Date, without access to the DIP Facility, the Debtors have only $100,000 and need approximately $250,000 to cover 60 days of operating expenses and repair the Valentine Field wells.  The relief requested by this Motion is necessary both to preserve the Debtors' operations as well as to provide the Debtors with a path forward for negotiating and consummating a restructuring transaction. The Debtors have been, and remain committed to, evaluating all value-maximizing paths forward. For these reasons, the Debtors respectfully request that the Court grant the Motion.

6.       As of the Petition Date, Debtors are indebted unto the Secured Lender in an amount in excess of Five Million One Hundred and Fifty-Eight Thousand Five Hundred Eight and 29/100 ($5,158,508.29) Dollars.  Debtors indebtedness to the Secured Lender is evidenced by, *inter alia*, (i) that certain *Promissory Note*, dated November 26, 2014, executed by Debtor, TNR Holdings, LLC, in favor of the Secured Lender, in the principal amount of Thirty Million and 00/100 ($30,000,000.00) Dollars ("Note"), (ii) that certain *Credit Agreement*, dated November 26, 2014,

as amended, (iii) that certain *Guaranty Agreement*, dated November 26, 2014, as amended, executed by Debtors, Mesa Gulf Coast, LLC, and Tchefuncte Natural Resources, LLC, in favor of the Secured Lender, and (iv) the following outstanding letters of credit issued by the Secured Lender to the Louisiana Office of Conservation at the request of and for the account of Debtors, to provide financial security for the plugging and abandonment of certain wells, associated site restoration. and emergency response, including, but not limited to, the following:

    a.  Letter of Credit No. SB73059T, issued December 9, 2014, at the request and for the account of Mesa Gulf Coast, LLC, in the original aggregate amount of $2,486,172.00, which amount was decreased to $2,225,768.00 by amendment dated June 29, 2016;

    b.  Letter of Credit No. SB73060T, issued December 9, 2014, at the request and for the account of Mesa Gulf Coast, LLC, in the original aggregate amount of $205,490.00, which amount was decreased to $181,368.00 by amendment dated June 29, 2016;

    c.  Letter of Credit No. SB73061T, issued December 9, 2014, at the request and for the account of Mesa Gulf Coast, LLC, in the original aggregate amount of $938,132.00, which amount was decreased to $563,448.00 by amendment dated June 29, 2016;

    d.  Letter of Credit No. SB73062T, issued December 9, 2014, at the request and for the account of Mesa Gulf Coast, LLC, in the aggregate amount of $433,865.00;

    e.  Letter of Credit No. SB73063T, issued December 9, 2014, at the request and for the account of Mesa Gulf Coast, LLC, in the aggregate amount of $539,466.00; and

    f.  Letter of Credit No. SB73064T, issued December 9, 2014, at the request and for the account of Mesa Gulf Coast, LLC, in the aggregate amount of $25,000.00.

7.      Debtors' indebtedness under the Note as of the Petition Date is in the principal amount of One Million One Hundred Eighty-One Thousand Eighty-Five and 00/100 ($1,181,085.00) Dollars, plus interest through September 20, 2019 in the amount of Eight Thousand Five Hundred Eight and 29/100 ($8,508.29) Dollars, plus interest continuing to accrue at a *per diem* of One Hundred Eighty-Four and 97/100 ($184.97) Dollars.

8.     Debtors' indebtedness is secured by, *inter alia*, that certain *Pledge and Security Agreement*, dated November 26, 2014, executed by Debtors in favor of the Secured Lender; that certain *Deposit Account Control Agreement*, dated November 24, 2014, executed by Debtors in favor of the Secured Lender; and that certain *Act of Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement,* dated November 26, 2014 (the "Mortgage"), as amended, whereby Debtor, Tchefuncte Natural Resources, LLC, granted a lien in favor of the Secured Lender over, *inter alia*, oil and gas leases, contract rights, easements and rights-of-way, permits, materials and equipment, inventory, hydrocarbon purchase and sale agreements, and accounts.  The Mortgage was filed in the Mortgage Records of Lafourche Parish, Louisiana, on December 11, 2014, and recorded at Instrument No. 1189798, Book 1700, Page 390, and in the Mortgage Records of Plaquemines Parish, Louisiana, on December 12, 2014, and recorded at Instrument No. 2014-00005045, Book 654, Page 850.  The following UCC-1 Financing Statements were also recorded: UCC Financing Statement filed by Debtor, TNR Holdings, LLC, with the Delaware Secretary of State, dated December 8, 2014, and recorded at Instrument No. 2014-4957866; UCC Financing Statement filed by Debtor, Mesa Gulf Coast, LLC, in the UCC records of Lafourche Parish, Louisiana, on December 9, 2014, and recorded at Instrument No. 1189651; UCC Financing Statement filed by Debtor, Tchefuncte Natural Resources, LLC, in the UCC records of Lafourche Parish, Louisiana, on December 9, 2014, and recorded at Instrument No. 1189652; UCC Financing Statement Amendment filed by Debtor, Tchefuncte Natural Resources, LLC, in the UCC records of St. Tammany Parish, Louisiana, on December 11, 2014, and recorded at Instrument No. 52-78372; and UCC Financing Statement filed by Debtor, Tchefuncte Natural Resources, LLC, in the UCC records of Lafourche Parish, Louisiana, on December 11, 2014, and recorded at Instrument No. 1189799.

## Jurisdiction and Venue

7.      The United States Bankruptcy Court for the Eastern District of Louisiana (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Bankruptcy Rules 2002 and 4001.

## Relief Requested

9.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and, together with the Interim Order, the "DIP Orders"):

    a.      authorizing the Debtors to obtain the DIP Facility, a secured postpetition financing on a priming basis pursuant to the terms stated herein;

    b.      authorizing the Debtors to use cash collateral of the Secured Lender;

    c.      granting liens and providing superpriority claims (collectively, the "DIP Superpriority Claims") with respect to such postpetition financing;

    d.      approving the form of adequate protection to be provided by the Debtors;

    e.      modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Orders;

    f.      scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order; and

    g.      granting related relief.

10.     The following chart contains the material terms of the proposed DIP Facility, provided however that to the extent that not set forth hereinbelow the terms of the DIP Facility shall be governed by the terms of the existing note, credit agreement, mortgage, security agreement and other loan documents by and between the Debtors and the Lender (collectively "Loan Documents").

| Terms of DIP Loan | |
|---|---|
| **Parties to the DIP** | **Borrower**: TNR Holdings, LLC<br>**Guarantor**: Mesa Gulf Coast, LLC and Tchefuncte Natural Resources, LLC<br><br>**DIP Lender**: Hancock Whitney Bank |
| **Term** | The maturity date with respect to the DIP Facility shall be the earliest of:<br><br>(a) five (5) months after the Petition Date;<br><br>(b) five (5) days after the Petition Date, if the Interim DIP Order has not been entered prior to the expiration of such period;<br><br>(c) thirty-five (35) days after entry of the Interim DIP Order if the Final DIP Order has not been entered prior to the expiration of such period;<br><br>(d) the effective date of an Approved Plan of Reorganization (the "Plan Effective Date");<br><br>(e) the closing of a sale of substantially all of the marketable assets of the Debtors;<br><br>(f) the date of prepayment in cash in full by the Debtors of all DIP Obligations and termination;<br><br>(g) the date of termination of the commitment to fund the DIP Facility and/or acceleration of the loans thereunder following the occurrence and during the continuation of an Event of Default. |
| **Commitment** | $150,000 |
| **Conditions of Borrowing** | The DIP Orders include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of the DIP Lender to make DIP Loans. |
| **Interest Rates** | 12% per annum |
| **Use of DIP Facility and Cash Collateral** | The proceeds of the DIP Facility shall be used to, among other things, (a) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases, (b) fund the costs of the administration of the Chapter 11 Cases (including the Carve Out), in each case subject to the Budget and Permitted Variance. |

| Fees | Secured Lender's legal fees and expenses shall be included in the amount of the DIP Loan but not count toward the $150,000 of availability.  Secured Lender's legal fees and expense as well as all amounts under the DIP Facility shall be paid at the maturity of the DIP Facility. |
|---|---|

| Budget | The use of cash and proceeds from the DIP Facility is subject to the Budget, attached to the Interim Order as **Schedule 1** to **Exhibit A**.<br><br>*See* Interim Order, Schedule 1. |
|---|---|
| Reporting Information | By the tenth day of each month, the Debtors will provide to the Lender a variance report for the immediately preceding four-week period ("Testing Period") then ended, in form and substance reasonably satisfactory to the Lender, detailing the following: (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Debtors against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget. |
| Variance Covenant | The Debtors shall not allow the aggregate disbursements made by the Debtors during such Testing Period to be greater than 115% of the aggregate disbursements for the Debtors set forth in the Budget for such Testing Period (the "Permitted Variance").  Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the written consent of the Lender (such consent not to be unreasonably conditioned, delayed, or withheld). |

| Liens and Priorities | Subject to the "Carve Out," the DIP Facility and the DIP Obligations shall at all times be secured by perfected first priority liens on and security interests in all of the Debtors' assets, including, without limitation, (a) all assets of the Debtors of the type securing the Lender's prepetition claim, (b) all personal property of the Debtors, (c) all oil and gas properties of the Debtors, (d) all claims of the Debtors, and (e) all deposit accounts, securities accounts and commodity accounts of the Debtors wherever held or located (collectively "DIP Collateral"). |
|---|---|
| Carve Out | A "Carve Out" of allowed professional fees and reimbursement of expenses of the Debtors' counsel, namely The Derbes Law Firm, LLC, shall be allowed in the amount of $60,000, plus statutory fees payable to the US Trustee's Office and $20,000 to be used by Debtor to prepare and file a final tax return and pay administrative expenses.  The Carve Out in favor of Debtors' counsel shall survive the conversion of this case to a Chapter 7 proceeding or the dismissal of the bankruptcy proceeding. |
| Challenge Period | Any challenge to the Lender's prepetition mortgages, security interests, and liens, shall be made upon the earlier of (a) 40 days after the Petition Date; (b) with respect to the committee, 30 days after the appointment of a creditors committee, but in any event not later than 60 days after the Petition Date (and, solely if no committee is formed, with respect to other parties in interest (other than the committee and the Debtors), 75 days after the Petition Date); and (c) the date of confirmation of a chapter 11 plan. |

| | |
|---|---|
| **Adequate Protection** | As adequate protection, Lenders, shall receive: (i) valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, which liens and security interests shall (a) be junior and subordinate only to the Carve Out and the DIP Liens, and (b) otherwise be senior to all other security interests in or liens on any of the DIP Collateral; and (ii) allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses, including those of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out and the DIP Superpriority Claim. |
| **Events of Default** | The events of default are a variance from the Budget other than a Permitted Variance, a failure to consummate a restructuring transaction within five months of the Petition Date, and an Event of Default under the Loan Documents. Upon an Event of Default, the Lender may terminate the DIP Facility upon Lender's issuance of a Termination Declaration to counsel for the Debtors. |
| **Waiver/Modification of the Automatic Stay** | Upon a Termination Declaration, the Debtors and any committee may seek an emergency hearing on an expedited basis to consider whether an Event of Default has occurred. Absent order of the Bankruptcy Court, within ten (10) days of the issuance of a Termination Declaration, the automatic stay shall be deemed lifted to allow the Lender to exercise any and all of its rights and remedies under the DIP Facility, the Loan Documents and at law subject to the Carve Out.<br><br>The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** | The Interim Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens, subject to the Challenge Period. |

| | |
|---|---|
| **Indemnification** | The Lender, its affiliates, and their respective related parties (each an "Indemnitee"), are each held harmless from and against any and all losses, claims, damages, liabilities, taxes, penalties and related expenses (including, without limitation, the fees, charges and disbursements of any counsel for any Indemnitee) and the Debtors shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, or asserted against any Indemnitee by any Debtor or by any other person arising out of or relating to the DIP Facility, the transactions contemplated hereby and thereby and any actual or proposed use of the proceeds under the DIP Facility; *provided* that no Indemnitee will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, bad faith, or willful misconduct of such Indemnitee. |

The DIP Facility shall be governed by the Interim Order and the Final Order without the necessity of any further documentation or filing or recordation of any mortgage, lien and security interest granted to Lender therein.

### Statement Regarding Significant Provisions

11.     The Interim Order and the Final Order, as applicable: (a) grants superpriority administrative expense claims to the Lender, subject only to the Carve Out; (b) binds the Debtors and all parties in interest with respect to the validity, perfection, or amount of the Lender's prepetition claims (each subject to certain challenge rights); (c) subject to the entry of the Final Order, as applicable, waives the Debtors' rights under section 506(c) of the Bankruptcy Code; (d) subject to the entry of the Final Order, as applicable, grants the Lender liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code; (e) imposes deadlines for the consummation of a restructuring transaction; and (g) grants adequate protection and liens to the Lender. The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating a consensual restructuring transaction.

12.     In light of the foregoing, the Debtors submit that these significant provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Interim Order, and then the Final Order, should be approved.

### Background

13.     TNR Holdings, LLC ("TNR") is the parent company and sole member of Mesa Gulf Coast, LLC ("Mesa") and Tchefuncte Natural Resources, LLC ("Tchefuncte"). Tchefuncte is the Lessee of the Fields and the owner of the oil and gas wells. Mesa is the "Operator" of record for the applicable wells in the Fields. Collectively, the Debtors own and operate oil and natural gas

wells in South Louisiana. The Debtors' assets predominately are oil and natural gas leases and wells.

14.     On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### The Debtors Have a Need for
### Debtor-in-Possession Financing and Use of Cash Collateral.

15.     The Debtors require immediate access to the DIP Facility in addition to continued use of the Prepetition Secured Parties' cash collateral (the "Cash Collateral"). As of the Petition Date, the Debtors' total unrestricted cash balance is approximately $100,000, which is insufficient to repair the Valentine wells, operate their remaining property, and continue paying debts as they come due.  The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations. As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.

16.     Recent events in the months leading up to the commencement of these chapter 11 cases have underscored the Debtors' need to access the proceeds of the DIP Facility and Cash Collateral on an interim basis. Specifically, the Debtors have faced a tightening liquidity crisis due to the declining production of the Valentine Field wells.  As a result of these and other demands,

the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases.

17.     The Debtors also rely on the encumbered cash generated from their operations to fund working capital and capital expenditures.  During the start of these chapter 11 cases, the Debtors will need this operating revenue to repair the Valentine Field wells, satisfy payroll, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

18.     The Debtor received its last substantial revenue check from the sale of oil and natural gas on September 20, 2019 which was for oil produced in August 2019.  The Debtor will not have any meaningful revenue until approximately 50 days after the Valentine Field wells are brought back to full production.  The Debtors anticipate the repair cost of the Valentine Field to be approximately $30,000 and the repair will take less than a week.  Although the Valentine Field may begin producing again in October, the Debtor will not receive that revenue until the end of November 2019.  Accordingly, the Debtor must have access to cash so that it can repair the Valentine Field and pay its expenses through the end of November when it will once again begin receiving revenue.

19.     Absent funds available from the DIP Facility and access to Cash Collateral, the Debtors would have to cease operations and eliminate their best chance for negotiating and consummating a transaction that would maximize the value of the estates.

**<u>Basis for Relief</u>**

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Facility.**

A.     **Entering into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment.**

20.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Facility and continue using the Cash Collateral on the terms set forth herein. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

43.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

44.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

45.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment. The Debtors negotiated the DIP Facility with the Lender in good faith, at arm's length, and with the assistance of its counsel, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' business judgment.

## B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.

50.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on all of the Debtors' assets, including previously unencumbered property and "priming" liens on all of the Debtors' assets.

51.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt with priority over any or all administrative expenses of the kind  specified in section 503(b) or 507(b) of [the Bankruptcy Code]; secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test

to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.   the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.   the credit transaction is necessary to preserve the assets of the estate; and

c.   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

52.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the prepetition secured parties have consented or (b) the prepetition secured parties' interests in collateral are adequately protected.

53.     The DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.  The Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. The Debtors sought postpetition financing from the Lender as well as parties who expressed an interest in acquiring certain of its assets to achieve the best terms available. The Debtors believe that the proposed DIP Facility represents,

under the circumstances of this case, very attractive terms which would not be available from any other lender. Given the Lender's first lien position on the Debtors' assets, the challenges inherent in winning a priming fight with the Lender, the volatile state of the oil and gas industry, and the terms offered by the Lender, the Debtors submit that alternative sources of financing are not available on better terms than that presented in the DIP Facility.

54. The Lenders have consented to the priming liens securing the DIP Facility.

56. Further, the Lender will receive adequate protection under the DIP Orders. Specifically, the Lender will receive adequate protection in the form of replacement liens over the DIP Collateral, superpriority administrative expense claims, and reimbursement of the fees and expenses of the Lender.

57. Accordingly, the Debtors submit that relief requested pursuant to section 364 of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**II.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.**

59. The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[2] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

---

[2] Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

11 U.S.C. § 363(c)(1). Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

60.     Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993).

61.     The Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value as the Debtors continue to negotiate toward a restructuring transaction. Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes. *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . .

resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

62.     The Debtors believe that the proposed adequate protection in the proposed Interim Order is necessary and sufficient for the Debtors to continue to use Cash Collateral. Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

## II.     The DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

64.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

65.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the Lender offered the most favorable terms on which to obtain vital postpetition financing, and (ii) arm's-length, good-faith negotiations between the Debtors and the Lender. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors

have been extended by the Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the Lender is entitled to all of the protections afforded thereby.

## IV.    The Automatic Stay Should Be Modified on a Limited Basis.

67.    The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders. The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order. Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents.

68.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *see also In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

69.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14

days after the service of such motion. Upon request, however, the court is empowered to conduct

an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral

to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See*

Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to

conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable

likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy

Code]." 11 U.S.C. § 363(c)(3).

70.    The Debtors require immediate access to the DIP Facility. As of the Petition Date,

the Debtors' total cash balance is $100,000, which is insufficient to operate their enterprise and

continue paying their debts as they come due. The Debtors' business is cash intensive, with

significant daily costs required to satisfy obligations.  As such, and due to their current limited

liquidity, the Debtors require immediate access to postpetition financing and the use of Cash

Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final

Hearing.

71.    The Debtors, through negotiations with the DIP Lender, developed the DIP Budget.

*See **Schedule 1** attached to **Exhibit A**, which is attached hereto.*  The DIP Budget establishes that

the Debtors will have adequate liquidity during this interim period if allowed to utilize the Cash

Collateral and access the DIP Facility. *See id*. The DIP Budget contains line items for each category

of cash flows anticipated to be received or disbursed during the time period for which the DIP

Budget is prepared. *See id*. The DIP Budget includes all reasonable, necessary, and foreseeable

expenses to be incurred in connection with the operation of their business for the period set forth

in the DIP Budget.

72.     The Debtors are seeking limited relief to, among other things, satisfy payroll, pay suppliers, meet overhead, make repairs to the Valentine Field well, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.

73.     Failure to obtain access to the DIP Facility and Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates. Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course or preserve and maximize the value of their assets for the benefit of all parties in interest.

74.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

**Request for Final Hearing**

75.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Emergency Consideration**

76.     Pursuant to Local Rule 9013-1(C), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors

believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations as this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

77.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

78.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

### Notice

79.     The Debtors will provide notice of this Motion to certain parties in interest, including: (a) the Office of the U.S. Trustee for the Eastern District of Louisiana (the "United States Trustee"); (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Lender and counsel thereto; (d) all secured creditors; (e) known administrative claimants; (f) Priority Claimants; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

80.     No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE,** the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Respectfully Submitted,

THE DERBES LAW FIRM, LLC

*/s/ Frederick L. Bunol*
Eric J. Derbes (La. Bar Roll No. 23464)
Frederick L. Bunol (La. Bar Roll No. 29111)
The Derbes Law Firm, LLC
3027 Ridgelake Drive
Metairie, LA 70002
Phone: 504-837-1230
Fax: 504-832-0323
Email: fbunol@derbeslaw.com
*Attorneys for Debtors*

**Exhibit A to DIP Motion**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| | * | |
| **TNR Holdings, LLC** | * | Case No. 19-12531 |
| | * | |
| Debtor | * | Section "A" |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| | * | |
| **Mesa Gulf Coast, LLC** | * | Case No. 19-12533 |
| | * | |
| Debtor | * | Section "A" |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| | * | |
| **Tchefuncte Natural Resources, LLC** | * | Case No. 19-12532 |
| | * | |
| Debtor | * | Section "A" |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**INTERIM ORDER APPROVING**

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING <u>THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING</u>**

The **DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND**

**FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION**

**FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TOSECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE,(IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING** ("DIP Motion") **[P-____]** filed by Debtors, TNR Holdings, LLC, Tchefuncte Natural Resources, LLC, and Mesa Gulf Coast, LLC ("Debtors"), came for hearing on September 24, 2019, at 2:00 p.m.,

APPEARANCES:      As reflected by the record

The Court, considering the DIP Motion, all notice and hearing requirements of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and any other applicable law having been satisfied, and further considering the law and evidence, and arguments made by counsel *[and no objections having been filed]*, the Court finds that cause exists for the interim relief requested and now enters the following:

**IT IS ORDERED, ADJUDGED, AND DECREED** that the Interim relief requested in the DIP Motion is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Debtors are authorized to immediately obtain the DIP Facility in the amount of $75,000 from Hancock Whitney ("Secured Lender") pursuant to the "Terms of DIP Loan" specifically set forth in the DIP Motion and the Debtor is authorized to use the proceeds of the DIP Facility in accordance with, and provided that aggregate disbursements do not exceed 115% of, the Budget attached hereto as **Schedule 1** without the written consent of the Secured Lender;

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that subject to the "Carve Out" as defined in the DIP Motion, the DIP Facility and the DIP Obligations, and all terms and conditions thereof as set forth in the DIP Motion, be and are hereby approved and the DIP Facility and the DIP Obligations shall at all times be secured by perfected first priority liens on and security interests in all of the Debtors' assets, including, without limitation, (a) all assets of the Debtors of the type securing the Secured Lender's prepetition claim, (b) all personal property of the Debtors, (c) all oil and gas properties of the Debtors, (d) all claims of the Debtors, and (e) all deposit accounts, securities accounts and commodity accounts of the Debtors wherever held or located (collectively "DIP Collateral"). The DIP Facility shall be governed by this Interim Order and the Final Order without the necessity of any further documentation or filing or recordation of any mortgage, lien and security interest granted to Secured Lender therein. Any and all non-bankruptcy law formalities required to perfect and enforce security interests in collateral are hereby waived.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that any challenge to the Secured Lender's prepetition mortgages, security interests, and liens, shall be made upon the earlier of (a) 40 days after the Petition Date; (b) with respect to the committee, 30 days after the appointment of a creditors committee, but in any event not later than 60 days after the Petition Date (and, solely if no committee is formed, with respect to other parties in interest (other than the committee and the Debtors), 75 days after the Petition Date); and (c) the date of confirmation of a chapter 11 plan.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that as adequate protection, Secured Lender, shall receive: (i) valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, which liens and security interests shall (a) be

junior and subordinate only to the Carve Out and the DIP Liens, and (b) otherwise be senior to all other security interests in or liens on any of the DIP Collateral; and (ii) allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses, including those of the kind specified in, or ordered pursuant to, section 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out and the DIP Superpriority Claim.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that pursuant to 11 U.S.C. §363(c)(2) the Debtors are authorized to use Cash Collateral of the Secured Lender provided that the aggregate disbursements are within 115% of the Budget attached hereto as **Schedule 1** with any proposed changes to the Budget greater than 115% of the aggregate disbursements requiring the written consent of the Secured Lender;

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Secured Lender is deemed to be a good-faith lender within the meaning of section 364(e) of the Bankruptcy Code and therefore the Secured Lender is entitled to all of the protections afforded by section 364(e).

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Secured Lender is granted superpriority administrative expense claims (collectively, the "DIP Superpriority Claims") with respect to the DIP Facility;

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified as follows:

a.      The Secured Lender is authorized to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to it under this Interim Order;

b.      The automatic stay is modified to the extent necessary to implement and effectuate the terms of this Interim Order; and

c.     Upon a Termination Declaration, the Debtors and any committee may seek an emergency hearing on an expedited basis to consider whether an Event of Default has occurred. Absent an order of the Bankruptcy Court, within ten (10) days of the issuance of a Termination Declaration, the automatic stay shall be deemed lifted to allow the Secured Lender to exercise any and all of its rights and remedies under the DIP Facility, the Loan Documents and at law subject to the Carve Out.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h) which is hereby waived.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that a final hearing (the "Final Hearing") to consider entry of the Final Order on the DIP Motion shall be held on **October 23, 2019 at 2:00 p.m.** and any objection shall be filed by October 16, 2019.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that movant shall serve a copy of this Order on the required parties who will not receive notice through the ECF system pursuant to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules and file a certificate of service to that effect within three (3) days.

**Schedule 1,** *in globo*

| | Revised Mesa Gulf Coast Budget | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9/19/2019 | | | | | | | | | | | | | | | | |
| | Gross Sales | | Net Sales | | Oil & Gas Pricing | | Net Revenue | | Severance Taxes | | Total | Valentine #22 MRWO | Delinquent | Cash In | Estimated Future | Marketing Fee | | | Net Cash Flow |
| | Oil | Gas | Oil | Gas | | | Oil | Gas | Oil | Gas | Net Revenue | 9/23/2019 | Lease Payments ** | Account ** | Additional Net Revenue ** | Valentine ** | LOE | G&A ** | |
| | (BOPM) | (MCFPM) | (BOPM) | (MCFPM) | ($/BO) | ($/MCF) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) | ($/Mo) |
| Sep-19 | 0 | 0 | 0 | 0 | $60.00 | $2.00 | $0 | $0 | $0 | $0 | $0 | $29,600 | $0 | $100,000 | | | $65,523 | $53,500 | -$48,623 |
| Oct-19 | 0 | 0 | 0 | 0 | $60.00 | $2.00 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $23,841 | | | $65,523 | $53,500 | -$95,182 |
| Nov-19 | 3,543 | 3,081 | 2,750 | 2,390 | $60.00 | $2.00 | $165,000 | $4,780 | $19,305 | $143 | $150,332 | $0 | $50,000 | $0 | $0 | $10,000 | $65,523 | $53,500 | -$28,691 |
| Dec-19 | 3,391 | 2,948 | 2,630 | 2,280 | $60.00 | $2.00 | $157,800 | $4,560 | $18,463 | $137 | $143,761 | $0 | $0 | $0 | $0 | | $65,523 | $53,500 | $24,738 |
| Jan-20 | 3,465 | 3,013 | 2,690 | 2,340 | $60.00 | $2.00 | $161,400 | $4,680 | $18,884 | $140 | $147,056 | $0 | $0 | $0 | $0 | | $65,523 | $53,500 | $28,033 |
| Feb-20 | 3,426 | 2,979 | 2,660 | 2,310 | $60.00 | $2.00 | $159,600 | $4,620 | $18,673 | $139 | $145,408 | $0 | $0 | $0 | $0 | | $65,523 | $53,500 | $26,385 |
| ** Estimates Provided by Derbes/Mesa Gulf Coast | | | | | | | | | | | | | | | | | | |

# Valentine Field Operating Expenses

## LOE

| Category | Monnie's Estimate $/Month | | |
|---|---|---|---|
| Ad Valorem Taxes | $6,600 | | |
| Chemicals | $4,600 | | |
| Compressor Rentals | $9,500 | | |
| Contract Pumpers & Housing | $11,000 | | |
| Construction Labor/R&M | $7,000 | | |
| Grass cutting / Spray/Road Maint | $2,250 | | |
| Equipment Rental | $2,740 | | |
| Hot Oil | $3,200 | | |
| Measurement / Meters | $250 | | |
| Utilities | $1,200 | | |
| Transportation & Fuel | $0 | | |
| Regulatory | $800 | | |
| Tools & Supplies | $3,000 | | |
| Insurance | $5,300 | | |
| ROW & Surface Lease Rentals | $7,833 | | |
| Gas & Oil Processing | $0 | | |
| Slickline Ops | $0 | | |
| Legal & Professional fees | $250 | | |
| | | | |
| **Total Monthly LOE** | **$65,523** | | |

# Mesa Gulf Coast

## G&A Estimate

| | Monnie's Estimate |
|---|---|
| **Category** | **$/Month** |
| Office Expenses/Supplies | $250 |
| Storage | $500 |
| Accounting | $7,500 |
| Mesa Gulf Coast Wages/FICA/Insurance | $10,000 |
| Monnie Greer's Fees | $25,000 |
| Chapter 11 (Debtor's Counsel) | $10,000 |
| **Total Monthly G&A** | **$53,250** |

| Valentine #22 | | |
|---|---|---|
| **MRWO Cost Estimate** | | |
| | | |
| | | |
| | | |
| | **Cost Estimate** | |
| **Day** | **$** | |
| Rig Down Hydraulic Unit | $2,500 | |
| Move Rig On Location | $3,500 | |
| Trucking | $1,500 | |
| Pull Rods | $3,800 | |
| Rebuild Downhole Pump | $5,500 | * |
| Run Pump & Rods in Hole | $3,800 | |
| Rig Down & Move Rig Off Location | $3,500 | |
| Rig Up Hydraulic Unit | $2,500 | |
| Trucking | $1,500 | |
| Vacuum Truck/Dispose of Fluids | $1,500 | |
| | | |
| | | |
| **Total Monthly G&A** | **$29,600** | |
| | | |
| **\* Rebuild of Downhole Pump may not be required** | | |